Good morning ladies and gentlemen. Our first case for argument this morning is United States v. Filer. Mr. Nettles. May it please the court, Brian Nettles on behalf of the appellant of the United States. The evidence in this case was sufficient for a rational jury to convict a defendant. The record shows that the district court improperly applied Rule 29. It substituted its interpretation of the evidence and its defendant's interpretation of the evidence and ignored facts in the record. Mr. Nettles, if you would raise your voice we would appreciate it. It's a very big room and that microphone does more to record than to amplify. Yes, Judge Ginsburg. In the course of representing his client, Mr. Filer was representing Paul Kelly and Mr. Kelly's company Barsani Woodwork. Mr. Filer used entities that he created for purposes of deception. He used a nominee and owner to conceal his client's interest. He had his client sign on behalf of a fictitious entity for purposes of making sure that the nominee owner didn't double-cross his client. He used false documents to mislead a state court all for the purpose of defrauding his client's unsecured creditors of their right to pursue claims against his client's company's property. He did this, as I'll explain, by essentially giving his client control of the secured creditor of his client's business and then using the rights of the secured creditor not for any legitimate purposes but simply to hold off the unsecured creditors. The first part of the scheme involved obtaining that secured credit. Harris Bank had a substantial debt owed to it by Barsani Woodwork. In the course of trying to negotiate with that bank, Mr. Kelly was unsuccessful. He retained Mr. Gehrig. Eventually, they retained a co-defendant, excuse me, Mr. Filer. They retained a co-defendant, Mr. Gehrig. Mr. Filer presented Mr. Gehrig not as an advisor of Mr. Kelly but as somebody who was going to be an investor bringing new money into the business. Gehrig represented that he was working on behalf of a company called BWC Holdings, which actually was owned by Kelly under a fictitious trust, which I'll get to. At some point, though, Harris Bank wanted to know that they were doing a deal with a true third party, not dealing with a debtor. At that point, they asked for proof that Mr. Gehrig could actually have authority to act on behalf of BWC Holdings. In order to do that, they would have had to provide to Harris Bank a document signed by Mr. Kelly, which would have revealed Mr. Kelly's role. So, Mr. Nettles, the district court noted and the defense reminds us that Harris Bank at least had some indications that Mr. Kelly and Mr. Gehrig were associated with each other, right? Yes. Because it was accounts receivable that were being used to make this offer of $500-some-odd-thousand to Harris Bank, right? Yes. So, what are we to make of that? Presumably, Harris Bank could ask all the questions it wanted. Well, I think there's a difference between knowing that Kelly is involved, and it's not unusual when a business is taken over that a key man stays on to provide management. And there's a difference between knowing that entities, assets of a business are being used, especially when you think an investor is coming to take over, and knowing that Kelly was actually the person through Gehrig as his nominee who was controlling the buyer. And that was something that was important to Harris Bank, and it's clear that they wouldn't have done this deal without it. We're not saying that Harris Bank is the ultimate victim in this case. But they needed to deceive Harris Bank in order to get Harris Bank's rights assigned to a successor company, BWC Capital. Could I ask you to address—I know there are a lot of topics this morning—but could I ask you to address how important you view the so-called assignments of capitals and millworks, of Gehrig's interest in capital and millworks, to this not-yet-existent Kay Family Trust? I think they're important for a number of purposes. I think they're important in a large respect to show the defendant's fraudulent intent. I think they're important—and the practical matter is whether or not the assignment was complete. And at some point later on as the case proceeds, Mr. Filer advised Mr. Gehrig that based on—Mr. Kelly—that based on the assignment, he actually could open an account. He had authority to open an account at a bank on behalf of BWC Capital. But really the important was—or the circumstances was that Gehrig was acting as Kelly's nominee owner. Filer had related to Kelly a prior case where the nominee owner refused to return back, control the business. And really the purpose of the assignment was just to keep Gehrig in line. Whether they were effective or not, whether the trust existed or not, all that had to happen was Gehrig had to believe that they were effective. Now the reality— Gehrig had done everything he needed to do to make them effective, correct? Yes. He did the most important thing. He had actually signed the assignment, the transfer of his interest, the assignment agreement. So that Kelly could then follow through, establish the family trust, and take control if and when necessary. Correct. There was no evidence that Gehrig needed to do anything other than what he'd done already. Mr. Nettles, moving to the third portion of the discussion, the bankruptcy proceeding, what exact documents do you say that Mr. Filer did not disclose in bankruptcy that would have constituted a material concealment? The material concealment would be based on the documents that showed the creation of the entities and the progression of the creation of the entities and the attempts to conceal Kelly's interest and control in those entities. Are they labeled or is there some type of moniker or description of them? Actually, I believe in our rebuttal brief, we include one of them. They are actual assignment agreements. They're described in Mr. Brant's email to Mr. Filer? Yes. He's described as material because the subpoena of the trust, the bankruptcy trustee, saw anything to do with Barsani Woodwork, and actually all the billing, the client was Barsani Woodwork, but they were doing this work to create documents relating to Barsani BWC Capital and Barsani Millwork under that client and under that client billing, and that's how he explained that they were relevant. But they certainly would have, at that point, made it quite clear that what happened was is that a situation had been created where the principal of the debtor had control of the security interest against his own company's assets and had used that interest to alienate the property away from his unsecured creditors. So, Mr. Nettles, let me ask you to address what strikes me as sort of the core of the defense argument, which is we don't have any apparent victims here. Nobody seems to have lost money as compared to the counterfactual of an earlier Harris Bank liquidation effort of Barsani. And in Mr. Filer's case, at least, it's hard to see much of a motive. I think first, to start with the second, with respect to the motive, I think he was benefiting his client, and it's clear in the communications that he expected and hoped that that client, that he was going to allow it to succeed with the assets that he had diverted, would he be able to have continuing business in the future. I gather this was a pretty minor part of Mr. Filer's practice at the relevant time. I would say so. But I think one of the issues, frankly, is Mr. Filer just misplaced his risk. He thought the risk of getting caught was slim to none, and the prospective payoff of a good client in the future was worth it. With respect to the first part of your question was with respect to the loss of property. Yeah, I mean, there was property because the assets were transferred, and they would have been available to the other creditors, and that was the equipment, the receivables, and then there was also the contract right for the Turner contract. Frankly, if there were nothing that would have been transferred, there was no reason for the defendants to commit this offense. If I can continue on, what happened then with respect to Harris Bank is they created another entity, Mr. Filer did, called BWC Capital, and that was actually owned by Mr. Garrick, and that's where Mr. Garrick was instructed to do the assignments, and it's interesting that the assignment of the rights of the actual assignment agreement was signed. So Garrick had already alienated his interest in that company before he went into Harris Bank and signed. In any event, the first part was completed because now, instead of simply paying off the debt on a settlement and having the debt be extinguished, and frankly, if the goal of the defendants of Mr. Filer, Mr. Kelly, was to help his other creditors, maybe they should have let the lien expire, let the debt expire, but they needed to keep that debt in existence and in the hands of BWC Capital. And one of the first things that Mr. Filer said after that in email was attack the union. It was understood in the course of as early as March that the process was going to be to get control of the debt, to hold off the other creditors, to transfer the assets, and to put the company in a Chapter 7 bankruptcy. And so the next step was they were in reaction to the union, because we call them the union, but it's the Carpenter's Trust Funds. They had lawsuits for unpaid contributions, and they had initially a judgment for $18,000. And at that point, the whole argument that this case is about the lien really falls apart, because Mr. Gehrig suggested that they use the lien as a way to basically tell the entities that the Carpenter's Trust were contacting in order to collect on their judgment, the citations, that we have a senior lien. Mr. Filer specifically decided not to do that. And I think it's telling that he understood that there were problems with that lien. Instead, what he did was he took the underlying debt and reduced it to judgment. He did not use the lien. So the whole argument of this case is about the lien. It doesn't exist. The problem that they had, though, was in order to file an action and go through the normal timeframe, they were up against another timeline, because the Carpenter's Trust Funds had another lawsuit, and they were marching towards finalizing their summary judgment and then finalizing the summary judgment. And so what they needed was an immediate judgment, and they needed to basically beat the Carpenter's Trust Fund. And that's where the Carpenters, Mr. Filer thought up using a confession of judgment. And he actually, in the email, is saying, basically, the Harris documents aren't what we think they are. We need to retool to get the judge to do what we want him to do. Retool was fabricate documents. And those documents were material, and they were the basis of that judgment, because they were a confession of judgment clause for both notes. And then in the court, those were backdated, because the consideration for the confession of judgment clause was a forbearance period. But they were backdated, so by the time they were signed, the forbearance period had already expired, and they were available to be used into court to support an immediate and expedited judgment, which would allow them and did allow them to beat the Carpenter's Trust to judgment. Just as importantly, you see Ashley Brandt, in the course of putting together the amount of the judgment, he was relying on the full amount of the note, the face amount of the note. Filer knew he was doing that. He said he had some concerns. Filer told him to talk to Gehrig, knowing Gehrig would not correct him. And the result was a greatly inflated judgment amount. And that's going to become important later, because that's important in the context of other unsecured creditors in a bankruptcy, when they are looking to see how much assets might be available in their transactional cost, that it's not worth it. The next thing that happens after you get the judgment is they backdate the asset transfer, and at the end it's never transfer, it's just transfer on paper, but it's designed to move it as far in the future. They couldn't do it out of the preference period, but move it far away from the bankruptcy filing, so that it would be less suspicious. And then they filed bankruptcy the day before. I'm not sure I understand what far away from the bankruptcy filing means. Probably all of these documents get examined in the bankruptcy. It gets moved further in the future. They could only do so much, but it was better than having it, if the assets had transferred literally the day before the bankruptcy, it would have looked more suspicious. So they did what they could. Well, a transfer within the preference period could, of course, be reversed instantly. So is it your position that this was designed to put it outside the preference recovery period? As a secured debt, I don't think it would have qualified, but I think the whole idea was to make it look suspicious that the debtor hadn't alienated his assets right before filing bankruptcy. Payments to secured debtors within the preference period are reversible. I'm just not sure what your position is about why this affected the bankruptcy. Do you think it affected the preference recovery process? No, I think what it affected— So what did it affect concretely? I think that trustees receive a minimal amount of money to pursue recoveries and client— So it was just designed to make the trustees snooze through the bankruptcy. Right. The hope all along was that the trustee—they drew a good trustee. They were hoping not to draw a good trustee, and the result would be it was a way to basically—they filed the bankruptcy because they wanted to stay the carpenters' trust action. They wanted to assert the transfer of the property, and they wanted to confront the other creditors with this overwhelming debt so that even if there was a recovery of the assets, if they were brought back in, the result would be they would get cents on the dollar. If there are no other questions, I'm going to preserve my last four minutes. It's just that they wouldn't. This was a benefit to an insider and, therefore, completely reversible in the bankruptcy. So everything boils down to contention that this is a fraud because it was designed not to actually affect what the bankruptcy court did or the way the bankruptcy law worked, but because it was designed to hoodwink the trustee into not using bankruptcy law correctly. And to issue a now-asset report, which could have been used to confirm the fact that the assets have been transferred. Well, all right. I'll reserve the rest of my time. Thank you, counsel. Mr. Safer. May it please the Court, Ron Safer on behalf of Mr. Filer. The problem with the last answer to your Honor's question, Judge Eastbrook, and to many of the things that Mr. Nettles just stated, is there is absolutely no evidence of it in the record. Absolutely no evidence of what? There is no evidence. He said that, well, they were hoping not to draw a good trustee.  You draw inferences from behavior, and the prosecutor is arguing a particular inference from particular behavior. Perfectly normal in a criminal case. But all of the bankruptcy process, as the district court held, was controlled by Mr. Falks, not by Mr. Filer. What about the document production? The document production, again, first the district court held, and the government is bound by it, that no document was withheld. No response. You've made a double jeopardy argument, which I find interesting. But what do we do with Brandt and his email and his testimony? In particular, about asking, or he asks Filer, or he tells him, I have not yet produced the documents indicating that Garrick had transferred his interests in BWC Capital to this nonexistent trust. And later confirms in email to himself and testifies that it was Filer who told him not to do that. Yes. And the first argument is that the government stopped from arguing that because of double jeopardy. Well, it's interesting. It's not persuasive to me. They have different elements. And the question here has not to do with the overall bankruptcy, but with Mr. Filer's role in it. Yes, but specifically with regard to this was a count in the indictment of which the judge acquitted Mr. Filer. And so the withholding of documents specifically was a factual finding that no responsive documents were withheld. The issue was whether or not- That was none were ultimately withheld, correct? None were withheld. Even the response, the issue was- When were those transfer, the assignments to the nonexistent trust, when were those produced and by whom in the bankruptcy? They were produced by Mr. Hartman, the general counsel at Freeborn and Peters, ultimately. When? During the bankruptcy process in response to a subpoena. Much, much later. Later. And this is what led then to the law firm paying the settlement, right? This is not what led to the law firm paying the settlement, but yes, it was done later. The issue is were those documents responsive? They were not responsive to the subpoena, number one. Number two, there is no evidence that Mr. Filer believed that they were responsive to the subpoena. The subpoena pertained to woodwork. The trust documents pertained to capital, an entirely different entity, and to millwork, an entirely different entity. You don't think the trustee would have wanted to know about this deal? Whether or not the trustee would have wanted to know about it, the trustee undoubtedly would have discovered this, but those documents were not responsive to the subpoena. That is what is in question. It's not when somebody is interpreting a subpoena or responding to a subpoena, an attorney doesn't say would the issuer of the subpoena. Did Mr. Filer testify about his interpretation of that subpoena? He did, Your Honor. And he said that he believed that these documents were not responsive. Indeed, Mr. Hartman, the general counsel of Freeborn, withheld those documents initially. Contrary to what he testified to initially, he then admitted that he withheld those documents. So what's the innocent, non-deceptive explanation for these assignment documents to this nonexistent trust? Yes, Your Honor. Here's what happened. First of all, they're the leash on Mr. Gehrig, right? They are a leash made of paper, papier-mâché. They're a leash that was ineffective. All Kelly had to do was set up the trust, right? Not true. No? No, absolutely not. So what Mr. Set up the trust, you backdate some more documents and make it look like it's existed for months? No, Your Honor. Why not? They had to agree on the price, and they never agreed on the price. So here's what the Kaye Family Trust documents were, and this is critical. Here's what they were. Capital had the control over the lien. They had the keys to the kingdom. They controlled Woodward. So that's a problem now because now they've, as Mr. Kelly has testified, they jumped from the frying pan into the fire. Gehrig could do exactly what Harris could. There was nothing that anybody could do to stop him, and Kelly testified that and Feiler testified to that. What this was was a reminder to Gehrig that you have agreed that at some later date, if at some later time, if the parties can agree that Kelly will have the right to repurchase that loan and thus repurchase the control over Woodward. That's all it was. Mr. Kelly specifically testified that the price was never agreed to, transcript 611 through 613, and even then, Mr. Gehrig, as Mr. Kelly testified, could decide to transfer ownership of the lien or not, and it was up to Gehrig. That's page 614 of the transcript. That's what Kelly testified to. So it is totally incorrect that Gehrig had done all that needed to be done to transfer his interest. The critical term was that Gehrig had to be paid, and just as Harris had to be paid. Paid a fee or paid the value of the company? Paid whatever Gehrig decided he wanted to get. That doesn't sound like much of a leash on him then. It's not. It was not a leash. It was, as Mr. Feiler testified, the best they could do, and as Mr. Kelly testified, the best they could do. There was nothing they could do to create a real control over Mr. Gehrig. And so that is what the Kay Family Trust was. The government, by the way, has said repeatedly that they would not argue that these ever became effective and that they did not become effective. These were not material to Harris. You know, Harris had nothing in the loan agreement that said that put any restriction on what Gehrig could do with the company once the – or with the lien once the transfer was done. Nobody hid these agreements. Kelly testified that Mr. Feiler never instructed him to conceal the agreements from anyone, and he shared the agreements with other freeborn lawyers. And Mr. Kelly testified that those agreements became a distant memory once they – once Mr. Gehrig did not exercise his right to foreclose on Woodward, which was his right indeed. But that's what Mr. Feiler and Mr. Kelly described as Gehrig going rogue. Yes. Yes, exactly. And this was simply, as they testified to, a reminder that, hey, you agreed you wouldn't do that. You agreed that you were going to give Mr. Kelly the opportunity if the price was agreed to, if Mr. Gehrig wanted to, to transfer that – to sell back to Mr. Kelly the keys to the kingdom. That never happened. And it was not executable by Mr. Kelly because the price had not been agreed to. They agreed to an initial price, and that changed before anything was paid. That price was the fee for Gehrig? That was the fee because the – Or was it? I don't remember, but it was – Order of magnitude? Yeah, $40,000 something in that area. So a tiny fraction of the debt. Exactly, because what was anticipated was that Mr. Gehrig was not going to stand in Harris's shoes for very long, that there was going to be new money coming into the company, and that Mr. Gehrig would go back to Florida and live his life. That didn't work out. They did not get new money. Mr. Gehrig got much more involved in the company. And as Mr. Kelly testified, they never agreed on a price to buy that back. So these agreements were no control at all over Mr. Gehrig ultimately. Interestingly, you have Mr. Kelly's testimony who says that. You have Mr. Filer's testimony who says that. I'd like you to discuss the backdated confession of judgment clause, which looks almost definitionally a fraud, especially after it was used to deceive the state court. First, Your Honor, it is completely immaterial. Let me first address why it was done. It was anticipated that the Harris papers had a confession of judgment in it. Yes, but it didn't. It did not. Right, so fraud was used to make it look as if it had. And that's a problem for you, I should think. It was not, Your Honor. It was not fraud. It was intentional deceit used to deceive because the state court wasn't in on any of this. Well, it was not, Your Honor. It was not intentional deceit. It was to effectuate an agreement that the parties believed existed at the time. Then what you do is you put a correct date on something and explain why this is carrying something out. But what actually happened was a false date was put on it, and then the parties went to the state court, told the state court that there was a confession of judgment clause as of a certain date, strongly implied that there was some kind of adversarial relation, which there wasn't, and obtained a judgment, which it's possible they would have obtained had they told the truth, but they didn't tell the truth. As I say, that's a problem for your client. First of all, Your Honor, what they did was they said that there was an agreement as of this date. That confession of judgment is completely immaterial. As the first witness testified to, the government's expert testified, that the same result could have been obtained, and we all know this, by a plaintiff going in, suing, and then the next day. Yes, it could have. But, in fact, a shortcut was taken, and the name of that shortcut is fraud. But it is not fraud, Your Honor, because fraud has to take some money or property to which somebody is not entitled. And here, the secured creditor, there was no even lawsuit necessary. They had a perfected Article IX security interest. That hardly seems clear. The security interest, when the original debtor effectively repurchases the loan, the security interest would vanish. It certainly would vanish in bankruptcy, because during the two-year preference period for preferences to insiders, that all goes poof, right? Steps were taken to make things look otherwise. And what I hear from you repeatedly is, well, we could have done this in an above-board way and come to the same conclusion. I don't think that's true with respect to a preference received by an insider in a case that comes into bankruptcy. But I hope you see my problem. Your Honor, the problem is, one, you have accepted the factual premise for which there is no evidence that Kelly controlled the secured creditor or was the secured creditor. He was not. Kelly had no ownership interest in capital. The question, when we're reviewing a jury verdict, is whether a reasonable jury could have concluded that Kelly had effective control. Now, I entirely understand your argument that that's not what the jury should have concluded. But I think it is what the jury did conclude. What the jury concluded, we do not know. The trial was hopelessly infected, and the judge has ordered that there be a new trial, and the government has not appealed that order. So exactly what the jury did, we do not know. But there was no evidence, Your Honor, none, from which the jury could have concluded that Kelly controlled capital. Kelly testified that Gehrig, not Kelly, owned capital. Kelly testified that Gehrig had sole control over capital's bank account. Surely, counsel, you know that there are such concepts as beneficial ownership. If you have a nominee who is supposed to be doing your bidding, that's commonly viewed as control, even though the nominee may choose to go rogue, which, of course, he didn't. But, Your Honor, he had the power to. He was not, and Kelly testified that he was afraid that he would exercise that power. And there was beneficial ownership, a concept never raised with the jury, a concept never raised by the government. So there is absolutely nothing in the record about that. The concept of control, however, was raised, right? That's the way it was litigated. And control alone is not enough to affect the validity of the lien. Now you're circling back to an issue that's not an issue, which is the ultimate legal effect of the lien. That's not the way the case was litigated. But, yes, so let me come back to control. There was no evidence that Kelly controlled Gehrig, none, from which the jury could conclude. Gehrig owned it. There was a corporation. The government did nothing to try to penetrate that corporation. The government had barely— So we go back to the assignments, right? The leash that Feiler and Kelly put together to try to keep a leash, even if it's not perfect on Gehrig, the reminder, as you put it. But that has no legal effect, Your Honor, none. That still doesn't give Kelly any control over Mr. Gehrig. Kelly testified to that. Feiler testified to that. Mr. Gehrig, a cooperating witness of the government, was not called by the government. The only evidence was that Gehrig had sole control over capital. Kelly so testified, Kelly could not even see the bank statements. And, Your Honor, in terms of a beneficial owner, he was a friendly creditor. That concept is used every single day in corporate transactions. The idea that that is somehow fraud cannot be the law, is not the law. There was no—coming back to the confession of judgment and the judgment itself. Capital was the secured creditor. The lien was valid. Indeed, the government says before this court that it's not arguing that the lien was invalid. It had, at all times, all times, the value of that lien dwarfed the assets. When the government says that there were other assets, that all depends on the right for woodwork or the ability of woodwork to get this Turner contract, because the accounts receivable plus the assets didn't come close to the lien. So it was the ability to do business. That was never going to happen. On this record, they were out of business at the time that the assignment is made. The Illinois Secretary of State has put woodwork out of business. They have dissolved the company. And Kelly testified that he did not have the money to pay to get them up and running. It was at that point that the assets—that the lien was executed and the assets were transferred, and that is not taking money or property from anyone, because the unsecured creditors were never going to have the right to get any of that money. Does it make a difference whether the papers, the judgment, the bankruptcy documents, reflected a $1.6 million secured lien versus a $600,000 lien? It did not, Your Honor. Why not? Because the assets were way below that. The assets were in the $100,000 to $200,000 range. If the judgment was $6 million— If you represent the Carpenters' Trust, for example, or the union that says we've been underpaid, does it make a difference how—might it affect how enthusiastic, how diligent you're going to be in looking for more assets and probing these various fraudulent transactions? Absolutely not, Your Honor, because the source is the same. The source is this lien. So if you can attack the lien, then you attack the lien, and if you can unwind that in bankruptcy, then you unwind it, as they sought to do. They didn't lose that right to pursue that. They exercised it. So if you can attack the lien, whether it's $6 million or $600,000, you do it. The amount is completely irrelevant as long as it was in this record. At all times, the amount of the assets were dwarfed by the real amount of the lien. Thank you. Thank you, counsel. Anything further, Mr. Netholz? First of all, counsel is incorrect. There's no evidence that the attempt with respect to the assignment agreements— the confession and judgment were designed to reflect the actual date the agreement was made. The evidence actually was no one had thought of this until Mr. Filer brought it up and it was quite clear that this was not to reflect the actual agreement of the parties, as far as the change in terms. The same result was not going to be justified if they had not gone back by virtue of an expedited lawsuit and the confession and judgment. Their concern, and clearly, whatever the reality might have been, that was Filer's concern. With respect to evidence that Kelly controlled capital or did not control capital, as the appellee's concerned, there's evidence throughout the record. The most important one is the whole discussion about whether capital is going to sue Barsani Woodwork. That's made by Filer and Kelly. Gehrig isn't even consulted on that. With respect to Kelly having control as far as not seeing the bank statements, that may be the case, but the reality was Kelly controlled what receipts of the company he gave to Gehrig. Finally, with respect to the issue of this is just a friendly creditor, Barsani, BWC Capital was not a creditor. They never provided any money here. Their interest came solely from use of the debtors' money. This is simply a case of zealous advocacy, whatever you want to call it. The district court described it as unsupported arguments to help expand the law. This was the use of false documents, and the fact that we've been arguing back and forth about various interpretations of the evidence, I think demonstrates that the district court improperly applied the Rule 29. Mr. Nichols, could you address the point that Mr. Safer made concerning the absence of any agreement on price for the exercise of the assignments? The only evidence of what Gehrig wanted was to be paid his consultant fee, and to the extent that there wasn't any final discussion about what other money he was going to get, it was if he would have gotten more money if he was able to get additional financing. When he provided his bill to—Mr. Gehrig provided his bill to Kelly, it was high, and Kelly actually went to Filer and told him, essentially, he didn't get you any financing. You're not going to pay him that much. So is Mr. Safer correct or incorrect in your view, and why, when he says that Kelly would not have been able to carry through on making those assignments effective? Looking at the assignment agreement, whether that stuff would have been filled out, it's been signed by Mr. Gehrig. There's nothing that would have stopped Kelly from simply filling in a number. The reality is, if it's not effective, why did Mr. Filer instruct Mr. Gehrig to sign the assignment agreement ahead of time? That was before the Harris deal, right? Yes, before the Harris deal. Frankly, there was no indication that Gehrig was going to go rogue. Kelly wasn't really concerned. It was Filer who got him concerned because he related a prior experience he had where a nominee owner did not return control of the property, and he told Kelly to be concerned about whether that was going to happen. There's no indication that Gehrig was going to do that. Gehrig had no ability to operate this company. I think you've addressed the jeopardy argument, and essentially what it comes down to, as I've said, this is all documents for deception. One of the things I'll also finish with is the whole idea, if Harris is out of the picture, why have Mr. Gehrig be the nominee owner of Millwork? Because that's how the business was going to continue, because actually they couldn't use Woodwork to get the Turner contract. They were getting it using Millwork, another entity where Gehrig was the nominee owner with this concealed interest. There's no reason. This has nothing to do with Harris. This is all a show that they're putting on for the unsecured creditors to make it look like there was legitimate transfer of assets through state court process, and Kelly does not control the successor. Thank you. Thank you, counsel. The case is taken under advisement.